IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KIMBERLY J. EAVES and
JASON E. EAVES,

           Plaintiffs

      vs.                             Case No. 13-1271-SAC

PIRELLI TIRE, LLC, a foreign
limited liability company;
PIRELLI NORTH AMERICA, INC.,
a foreign corporation;
PIRELLI TYRE S.p.A,
a foreign corporation;
PIRELLI & C. S.p.A.,
a foreign corporation;
PIRELLI PNEUS LTDA.,
a foreign corporation; and
LEMANS CORPORATION,
a foreign corporation,

           Defendants.[1]

MEMORANDUM AND ORDER

      Jason and Kimberly Eaves, husband and wife, were riding a motorcycle in Jasper county, Iowa, on July 17, 2011, when the rear tire blew out causing a serious accident. Jason had purchased this rear tire, a Metzeler ME 880 Marathon MDS tire in Manhattan, Kansas, on or about September 22, 2010. This is a product liability action where it is alleged the accident was caused or contributed to by a tire manufacturing defect, tire design defect, or a failure to warn of appropriate use and application of the tire.

---

[1] The above caption does not include the two defendants dismissed without prejudice in January of 2014. (Dk. 47).

The defendants, Pirelli & C. S.p.A., (Dk. 30) ("Pirelli & C"); Pirelli Pneus Ltda ("Pirelli Pneus"), (Dk. 32); Pirelli Tyre S.P. A. ("Pirella Tyre"), (Dk. 34) separately move for dismissal pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process. In their complaint, the plaintiffs allege that as to the defendant Pirelli Pneus, it was incorporated in Brazil with its principal place of business in Santo Andre, Brazil, and as to the defendants, Pirelli & C and Pirelli Tyre, they are incorporated in Italy with their principal places of business in Milan, Italy. For all three defendants, the complaint alleges they are:

> engaged in the business of designing, manufacturing, marketing, distributing, and selling tires which are ultimately distributed and sold throughout the United States, including the State of Kansas, and are sold for economic benefit in retail stores through the State of Kansas. By seeking a nationwide distribution of its tires, Defendant Pirelli Tyre S.p.A. [and Defendant Pirelli & C. S.p.A.] has purposefully availed itself of doing business in the State of Kansas and has sufficient minimum contacts to justify being subject to the jurisdiction of this Court. This Court has jurisdiction over Defendant Pirelli Tyre S.p.A. [and Defendant Pirelli & C. S.p.A.] in that Defendant, upon information and belief, knowingly supplies tires for sale in stores and with retailers throughout the State of Kansas and the United States, and it supplied a defective tire that was distributed under conditions establish by Defendant Pirelli Tyre S.p.A. [and Defendant Pirelli & C. S.p.A.], causing injury to the plaintiffs in the State of Iowa.

(Dk. 1, ¶¶ 9, 11).

The plaintiffs' complaint alleges the following details on the moving defendants' corporate structure. Head of a multinational Group with worldwide operations in the tire business, Pirelli & C "owns and controls all

the Group's operations." (Dk. 1 ¶ 16.). Pirelli & C "manages, finances, and coordinates the operation of its subsidiaries." *Id*. at ¶ 17. Pirelli Tyre "engages in the design, development, production, and marketing of tires" with factories around the world. *Id*. at ¶ 18. Pirelli & C and Pirelli Tyre share the same address. *Id.* at ¶¶ 19 and 20. "Defendant Pirelli Tyre S.P.A. handles the tire business for the multinational Group of business held ultimately by Defendant Pirelli & C. S.p.A. Defendant Pirelli Pneus LTDA is a Brazilian subsidiary of Pirelli Tyre, S.p.A." *Id*. at ¶ 27. Pirelli & C owns 100% of Pirelli Tyre, *id*. at ¶ 29, and, in turn, Pirelli Tyre owns 100% of Pirelli Pneus. *Id*. at ¶ 26.

As for the defendants' distribution network, the plaintiffs allege that the Defendant LeMans Corporation is "the sole United States distributor of Pirelli tire products," *id*. at ¶ 30, and that the moving defendants "have established through Defendant LeMans Corporation a nationwide network for distribution of their products, . . . to the United States' consumer market, including the State of Kansas," *id*. at ¶ 31. The complaint describes LeMans Corporation as operating a website with the name of Parts Unlimited that enables it to reach consumers across the United States, including Kansas. *Id*. at 32. The plaintiffs allege all defendants were aware that the "ordinary distribution channels and subsequent use" of the subject tire and other tires manufactured by Pirelli Tyre or by companies owned and/or operated by Pirelli included the State of Kansas. *Id*. at ¶ 34. The complaint includes, that

"[a]t all times material hereto, all Defendants were actively seeking business in Kansas, including but not limited to through the internet and through a specialized sales force." *Id.* at ¶ 35. The complaint concludes that, "the Pirelli Defendants . . . use of an exclusive distributor for motorcycle tires to reach all fifty (50) states, including the State of Kansas, constitutes purposeful availment." *Id.* at ¶ 39.

In support of their Rule 12(b)(2) motions, the defendants submit affidavits challenging the plaintiffs' allegations for grouping the defendants for jurisdictional purposes and attributing them with Pirelli Pneus' manufacturing activities and with LeMans' business contacts and marketing activities within Kansas. Pirelli & C and Pirelli Tyre deny that they designed, manufactured, distributed or sold the tire in question. Pirelli & C is the holding company for the stock of Pirelli Tyre which is the holding company for Pirelli Pneus. Even so, Pirelli & C and Pirelli Tyre submit affidavits from knowledgeable business directors showing that they have separate management and boards from Pirelli Pneus, that they do not pay the salaries of Pirelli Pneus' employees, and that Pirelli Pneus is responsible for its own financial management and generates its own substantial revenue. All three moving defendants offer affidavits showing no contacts with Kansas in terms of business, legal, employment, physical, or marketing activities. As for

LeMans, the defendants cite the deposition evidence[2] tendered by the plaintiffs and note that it does not show any affiliation between LeMans d/b/a Parts Unlimited and a Pirelli group member other than being a customer of Pirelli Tire LLC.[3] Thus, the defendants challenge the plaintiffs as having failed to make a prima facie case of connections between them and the forum state and of their involvement in an orchestrated and sophisticated global distribution system that included Kansas as a target.

On a Rule 12(b)(2) motion, the burden is with the plaintiff to establish personal jurisdiction, and the weight of this burden varies with the stage of proceeding. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008); *Smalls v. Stermer*, 2011 WL 1234781, at *2 (D. Kan. 2011), *aff'd*, 457 Fed. Appx. 715 (10th Cir. Jan. 10, 2012). At this stage which is in advance of an evidentiary hearing, "the plaintiff must only make a prima facie showing of personal jurisdiction . . . 'by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over'" each of the moving defendants. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007) (quoting *TH Agric. & Nutrition, LLC v.*

[2] This is the Rule 30(b)(6) deposition of Alexander Rosenzweig, in-house counsel with Pirelli North America, Inc., taken May 11, 2012, in the case of *Garrard v. Pirellia Tire, LLC, et al.*, No. 11-00824, that was filed in the United States District Court for the Southern District of Illinois. The defendants raise several objections to the use of this deposition and to the extent of this witness's personal knowledge on certain corporate practices and business activities.

[3] Rosenzweig testified that Pirelli Tire LLC doesn't "know what LeMans does in terms of selling Metzeler tires after they buy them from us. This is very closely guarded information by LeMans." (Dk. 102-3, p. 78).

*Ace European Group Ltd.*, 488 F.3d 1282, 1286 (10th Cir. 2007)). The court takes "as true all well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiff's complaint." *Shrader* v. *Biddinger,* 633 F.3d 1235, 1239 (10th Cir. 2011) (internal quotation marks and citation omitted). The court, however, does not accept as true those allegations in the complaint contradicted by the defendant's affidavits, but it must "resolve any factual disputes in the plaintiff's favor." *Melea*, 511 F.3d at 1065.

Applying these rules to the parties' submissions, the court accepts the allegations from the plaintiffs' complaint that are not contradicted by the defendants' affidavits and the facts evidenced in the defendants' affidavits that are not disputed by competent proof from the plaintiffs. Pirelli & C is the holding company for the stock of Pirelli Tyre, and Pirelli Tyre is the holding company for the stock of Pirelli Pneus, S.A. Pirella Tyre also holds 100% of defendant Pirelli North America, Inc. which in turn holds 100% of Defendant Pirelli Tire, LLC, which has its principal place of business in Rome, Georgia, and has LeMans as its sole American customer for Metzeler motorcycle tires. Pirelli Tire, LLC processes the warranty claims on behalf of Pirelli-manufactured tires.

The tire that is the subject of this lawsuit was manufactured by Pirelli Pneus, S.A. The affidavit of Maurizio Sala, Planning and Controlling Director for Pirelli Tyre, S.p.A., the affidavit of Francesco Tanzi, Chief Financial Officer for Pirelli & C, and the affidavit of Mario Batista, Latin

America Corporate Affairs Director for Pirelli Pneus[4] show that Pirelli & C and

Pirelli Tyre are distinct corporate entities from Pirelli Pneus which is

separately managed with its own board of directors and with all of the

commercial transactions between them being the subject of lawful contracts.

Pirelli Pneus, S.A. keeps its own books and financial statements and handles

its own financial management and accounting. Pirelli Pneus, S.A. enjoys

significant revenue from its own business activities and products, and

neither Pirelli Tyre nor Pirelli & C pays the salaries of any Pirelli Pneus'

employees.

       From the annual financial reports of Pirelli & C, the plaintiffs

excerpt several statements to build an argument that Pirelli & C sits atop all

the subsidiaries, controls their relevant operations, and directs a global

distribution network for its tires that extends to Kansas. They cite, "At

December 31, 2012, the Non-EU Companies that were directly or indirectly

controlled by Pirelli & C, S.p.A. and of material interest pursuant to Article

36 of the Market Regulation:  Pirelli Pneus Ltda (Brazil); Pirelli Tire LLC

(USA); . . . ." (Dk. 38-1, p. 102). It is noted that the chairman of Pirelli & C's

board is also the Chief Executive Officer of Pirelli Tyre. The financial report

refers to a "Pirelli Group" and defines it as "all the companies included in the

scope of consolidation of Pirella & C. S.p.A." (Dk. 38-1, p. 106). The report

later outlines, "scope of consolidation" to include "subsidiaries," that is, "[a]ll

---

[4] These three affidavits will be referred to hereafter as the business
affidavits.

companies and entities whose financial and operating policies are subject to control by the Group are considered subsidiaries." *Id.* at p. 167. While the appearance of these statements is evidence of some control, the plaintiffs are seeking to allege a level of control exceeding the typical relationship between a holding or parent corporation and its subsidiary corporation. The plaintiffs do not offer the detail or evidence to sustain their conclusory allegations in this respect. As will be discussed later, alleging facts for an agency relationship or for piercing a corporate veil require more.

The tire in question was not designed, manufactured or sold by Pirelli C or by Pirelli Tyre, and they did not place this tire into the stream of commerce. As for how the subject motorcycle tires entered into the stream of United States commerce, the plaintiffs' memoranda quote and incorporate the following averments submitted by the defendants:

> The process by which tires manufactured by Pirelli Pneus were distributed by LeMans was as follows: (1) LeMans places a tire order on a central ordering system to which Pirelli Tire, LLC has access (Pirelli Pneus, Ltda. does not have access to the ordering system); (2) based on multiple factors, including the type of tire requested and size of tire requested, a manufacturing facility is selected to make the order; (3) Pirelli Tire LLC is notified when the order is ready for shipment; (4) Pirelli Tire LLC then notifies LeMans or LeMans' freight forwarder, Phoenix International Freight Services Limited ("Phoenix"), that the order is ready; (5) LeMans directs Phoenix to arrange for tires manufactured by Pirelli Pneus Ltda. to be picked up in Brazil; (6) Phoenix then arranges for those tires to be shipped (in a container provided by Phoenix) from Brazil to LeMans in the United States (all charges and responsibility for such items as international carriage and Customs clearance to be born by LeMans); (7) after Phoenix picks up the tires, Pirelli Tire LLC sends LeMans an invoice for such tires; and (8) LeMans distributes the tires to various tire dealers in the United States.

(Pirelli Pneus' memorandum, Dk. 33, p. 14; Plaintiffs' memoranda Dk. 38, p. 6; Dk. 39, p. 6; Dr. 40, p. 6). From this, the plaintiffs speculate "the Pirelli Group, which includes Pirelli Pneus, was at all times aware that the subject Metzler tire[s] . . . were being placed into the Kansas' stream of commerce through the aforementioned distribution channels." *Id*. The defendant Pirilli Pneus, however, offers the balance of the affidavit of Marcelo Natalini, the Business Unit Motorcycle Latin America Director for Pirelli Pneus, who avers that Lemans "solely determines where the tires will go" and that once the tires are picked up at the Brazil plant by Phoenix, then Lemans assumes all freight charges, customs duty, marine insurance and paperwork responsibilities. (Dk. 33-2, ¶ 21). Natalini further avers that LeMans unilaterally decides where to send tires, that Pirelli Pneus does not control LeMans which is a separate entity, and that Pirelli Pneus does not direct or guide LeMans' advertising or sales efforts. *Id.* at ¶¶ 22-24. Both Batista and Natalini aver on behalf of Pirilli Pneus that it "does not and has never sold tires to LeMans." (Dk. 33-1, ¶ 20; 33-2, ¶ 20).

Short of attributing them with the activities of LeMans d/b/a Parts Unlimited, none of the moving defendants have any real or meaningful connections to the State of Kansas. They are not residents of the State, have no offices here, and are not licensed to do business in Kansas. They have not regularly transacted business here and do not maintain a registered agent for service of process. They have never sold goods or

services in the State of Kansas and have never advertised or solicited business here. They have never contracted with a Kansas resident or entered into a contract which was to be performed in whole or in part in Kansas. They have never marketed any products through a distributor who served as a sales agent to Kansas. They do not own, lease or rent any property in Kansas and maintain no bank accounts, loans, accounting work or administrative functions here.

"Personal jurisdiction is established by the laws of the forum state and must comport with constitutional due process." *Fireman's Fund Ins. Co. v. Thyssen Min. Constr. of Canada, Ltd.*, 703 F.3d 488, 492 (10th Cir. 2012). As liberally construed by Kansas courts, the forum's long-arm statute extends "personal jurisdiction over nonresident defendants to the full extent permitted by the due process clause of the Fourteenth Amendment of the United States Constitution." *In re Hesston Corp.*, 254 Kan. 941, 951, 870 P.2d 17 (1994) (internal quotation marks and citation omitted). Because the forum's long-arm statute is co-extensive with limitations set by the due process clause, the court will "proceed directly to the constitutional issue." *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994).

Due process analysis entails two steps:  first, "whether the non-resident defendant has minimum contacts with the forum state such that he should reasonably anticipate being haled into court there," and if that step is

met, then second, "whether the court's exercise of jurisdiction over the defendant offends traditional notions of fair play and substantial justice, that is, whether the exercise of jurisdiction is reasonable under the circumstances." *Melea, Ltd.*, 511 F.3d at 1065-66 (internal quotation marks and citations omitted). The first step requiring "minimum contacts" is cleared either by general jurisdiction, when "a defendant has continuous and systematic general business contacts with the forum state," or by specific jurisdiction when a defendant "purposefully direct[s] its activities at the state residents" and "the cause of action arises out of those activities." *Melea, Ltd.*, 511 F.3d at 1066 (internal quotation marks and citations omitted); *see Daimler AG v. Bauman*, --- U.S. ---, 134 S. Ct. 746, 751 (2014) (for general jurisdiction, the minimum contacts are "so constant and pervasive 'as to render [it] essentially at home in the forum State." (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, --- U.S. ---, 131 S. Ct. 2846, 2851 (2011)); *Fireman's Fund Ins. Co.*, (for specific jurisdiction, the minimum contacts must come from the defendant having "purposefully availed itself of the privilege of conducting business within the forum State" and "must make being sued there foreseeable so that the defendant could reasonably anticipate the suit." (internal quotation marks and citations omitted)). "In all events, the shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous,

or attenuated contacts' with the forum state." *Dudnikov*, 514 F.3d at 1071

(quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Pirelli Group

In arguing for both general and personal jurisdiction, the

plaintiffs bring all the defendants, including the moving defendants, under

the umbrella of the "Pirelli Group." They do so based, in part, on

Pirelli & C's financial statements' use of the term "Pirelli Group" defined as

"all the companies included in the scope of consolidation," (Dk. 38-1, p.

106). The "scope of consolidation" includes "subsidiaries," that is, "[a]ll

companies and entities whose financial and operating policies are subject to

control by the Group . . . [which] is normally satisfied when the Group owns

more than half of the voting rights." *Id*. at p. 167. The plaintiffs point to the

descending chain of holding companies from Pirelli & C to Pirelli Tyre to

Pirelli Pneus and Pirelli North American to Pirelli Tire and its merger with

Metzeler Motorcycle Tire North America. From these circumstances, the

plaintiffs leap to characterizing all of the defendants' tire business activities

as a single sophisticated and orchestrated global distribution system and

then to making every corporate activity attributable to each entity. The

sweeping terms of these allegations resemble in character what have been

regarded as conclusory allegations rather than plausible and non-speculative

allegations. *See Shrader v. Biddinger,* 633 F.3d 1235, 1248 (10th Cir.

2011); *Pro Fit Management, Inc. v. Lady of America Franchise Corporation*,

2010 WL 4810227 at *3 (D. Kan. Nov. 19, 2010). More troubling to the court, is that the plaintiffs fail to argue and apply a particular legal theory for its allegations of treating all of these distinct legal entities as one. It is not this court's burden to proceed with an agency or alter ego legal theory and advocate its application here.

The Supreme Court recently noted that some federal appellate courts "have held, that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego." *Daimler AG* v. *Bauman*, ---U.S.---, 134 S. Ct. 746, 759 (2014). "A holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (internal quotation marks and citation omitted), *cert. denied*, 544 U.S. 974 (2005); *see Birmingham v. Experian Information Solutions, Inc.*, 633 F.3d 1006, 1018 (10th Cir. 2011) ("A subsidiary corporation is presumed to be a separate and distinct entity from its parent corporation.") (internal quotation marks and citation omitted)); *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 344 F. Supp. 2d 686, 691 (W.D. Wash. 2003)[5]. The plaintiffs have not cited legal authority

---

[5] "'Appropriate parental involvement includes "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."'" 344 F. Supp. 2d at 691 (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (quoting in turn *United States v. Bestfoods*, 524 U.S. 51, 72 (1998)).

for an alter ego claim here and their conclusory allegations fall short of presenting a prima facie claim. The moving defendants submit business affidavits that show the relationship between the manufacturer Pirelli Pneus and either Pirelli & C or Pirelli Tyre is that they "are separate, distinct legal corporate entities, each maintaining their own corporate formalities as evidenced by . . . separate management; . . . . own financial management and accounting, . . .; . . . separate boards of directors; and Pirelli Pneus S.A. generates substantial revenue from its own business activities and products." (Dk. 31-1, p. 5; 35-1, p. 5). The affidavits further state that "[a]ll commercial transactions" between Pirelli Pneus and either Pirelli & C or Pirelli Tyre "are set out in legally enforceable contracts." *Id.* "[E]ven well-pleaded jurisdictional allegations are not accepted as true once they are controverted by affidavit (here, based on personal knowledge of the party with direct access to operative facts)." *Shrader v. Biddinger*, 633 F.3d at 1248 (citation omitted). Without "specific averments, verified allegations, or other evidence sufficient to create a genuine issue of fact," the defendants' affidavits "carry the issue" on the alter ego analysis. *See id.*

---

"'An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations.'" *Id.* (quoting *Unocal Corp.*, 248 F.3d at 926). And "whether, in the truest sense, the subsidiary's presence substitutes for the presence of the parent." *Id.* (quoting *Unocal Corp.*, 248 F.3d at 928-29)

The plaintiffs similarly fail to articulate a viable agency claim and to support it with plausible factual allegations. The Supreme Court in *Daimler* observed:

> Agencies, we note, come in many sizes and shapes: "One may be an agent for some business purposes and not others so that the fact that one may be an agent for one purpose does not make him or her an agent for every purpose." 2A C.J.S., *Agency* § 43, p. 367 (2013) (footnote omtted). A subsidiary, for example, might be its parent's agent for claims arising in the place where the subsidiary operates, yet not its agent regarding claims arising elsewhere.

134 S. Ct. at 759. This highlights the court's difficulty in attaching significance to the plaintiffs' sweeping allegations based on Pirelli & C's financial statements. For example, as the moving defendants point out, Pirelli & C's "financial risk management" of subsidiaries in lending money is an entirely different matter from controlling "distribution, production, or sales" of tires, in particular, motorcycle tires. (Dk. 49, p. 7); *see supra* n. 5. Discussing the agency relationship in the personal jurisdiction setting, the Tenth Circuit has observed that such a relationship is not presumed but "must be clearly demonstrated" and that it is a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 459 (10th Cir. 1996) (internal quotation marks and citation omitted). The plaintiffs' allegations and proof do not come close to making a prima facie case of alter ego or agency. *See Coe v. Philips Oral Healthcare Inc.*, 2014

WL 585858 at *5 (W.D. Wash. Feb. 14, 2014) (one entity is involved in daily running of the other and there is overlapping management).

This agency question will be discussed again in looking at the plaintiffs' efforts to establish specific jurisdiction based on LeMans' sales in Kansas as an alleged distributor/agent. The Supreme Court certainly has indicated that agency principles will guide the analysis and weighing of distributor activity in the forum:

> Agency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction. "[T]he corporate personality," *International Shoe Co. v.* Washington, 326 U.S. 310 (1945), observed, "is a fiction, although a fiction intended to be acted upon as though it were a fact." *Id.* at 316. *See* generally 1 W. Fletcher, *Cyclopedia of the Law of Corporations* § 30, p. 30 (Supp. 2012-2103) ("A corporation is a distinct legal entity that can act only through its agents."). As such a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there. *See, e.g., Asahi*, 480 U.S. at 112 (opinion of )'Connor, J.) (defendant's act of "marketing [a] product through a distributor who has agreed to serve as the sales agent in the forum State" may amount to purposeful availment); *International Shoe*, 326 U.S. at 318 ("the commission of some single or occasional acts of the corporate agent in a state" may sometimes "be deemed sufficient to render the corporation liable to suit" on related claims). See also Brief for Petitioner 24 (acknowledging that "an agency relationship may be sufficient in some circumstances to give rise to *specific* jurisdiction").

*Daimler AG v. Bauman*, 134 S. Ct. at 759 n.13.

### General Jurisdiction

"Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." *Benton v. Cameco Corp.*, 375 F.3d

1070, 1080 (10th Cir. 2004) (internal quotation marks and citation omitted).

Factors relevant to consider include:

> "In assessing contacts with a forum, courts have considered such factors as:  (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements listings, or bank accounts; and (4) the volume of business conducted in the state by the corporation."

*Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d at 457 (quoting *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir. 1996)); *see Monge v. RG Petro-Machinery (Group) Co. Ltd.*, 701 F.3d 598, 620 n.9 (10th Cir. 2012) (a 12-factor test used for Utah cases, *Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292, 1295-96 (10th Cir. 1999), and the four-factor test used for other states). Supreme Court decisions establish the court's inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. at 761 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. at 2851). For a foreign corporation, the "paradigm bases for general jurisdiction" are the "place of incorporation and principal place of business." *Daimler AG*, 134 S. Ct. at 760 (internal quotation marks and citations omitted). The Supreme Court's conclusion in *Daimler AG* is revealing:

Here, neither Daimler nor MBUSA is incorporated in California, nor does either entity have its principal place of business there. If Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA's sales are sizable. Such exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' *Burger King Corp. [v. Rudzewicz]*, 471 U.S. [462] at 472 [(1985)] (internal quotation marks omitted).

*Daimler AG*, 134 S. Ct. at 761-762. The principles of general jurisdiction certainly are to respect foreign defendants' efforts "to structure" their activities as to assure them that such "will not render liable to suit." *Id.*

In arguing for general jurisdiction, the plaintiffs rely on the moving defendants putting the tires into a stream of commerce and then using LeMans as its "exclusive distributor and agent." (Dk. 40, p. 20). The Supreme Court recently clarified that such a stream of commerce argument for general jurisdiction has been rejected:

Most recently, in *Goodyear*, we answered the question: "Are foreign subsidiaries of a United States parent corporation amenable to suit in state court on claims unrelated to any activity of the subsidiaries in the forum State?" 564 U.S., at ———, 131 S.Ct., at 2850. . . . We reversed, observing that the North Carolina court's analysis "elided the essential difference between case-specific and all-purpose (general) jurisdiction." *Id.*, at ———, 131 S.Ct., at 2855. Although the placement of a product into the stream of commerce "may bolster an affiliation germane to specific jurisdiction," we explained, such contacts "do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant." *Id.*, at ———, 131 S.Ct., at 2857 . As *International Shoe* itself teaches, a corporation's "continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." 326 U.S., at 318, 66 S.Ct. 154. Because

> Goodyear's foreign subsidiaries were "in no sense at home in North Carolina," we held, those subsidiaries could not be required to submit to the general jurisdiction of that State's courts. 564 U.S., at ————, 131 S.Ct., at 2857. *See also J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ————, ————, 131 S.Ct. 2780, 2797–2798, 180 L.Ed.2d 765 (2011) (GINSBURG, J., dissenting) (noting unanimous agreement that a foreign manufacturer, which engaged an independent U.S.-based distributor to sell its machines throughout the United States, could not be exposed to all-purpose jurisdiction in New Jersey courts based on those contacts).

*Daimler AG*, 134 S. Ct. at 757. The plaintiffs' stream of commerce arguments are to no avail for general jurisdiction. The evidence of record establishes that LeMans is an independent distributor of Metzeler tires, and there is no viable ground for extending general jurisdiction to the moving defendants based on LeMans' sales and marketing activities. The factors applied by the Tenth Circuit plainly weigh against general jurisdiction. The affiliations between the moving defendants and Kansas are not continuous and systematic and do not render them essentially at home in Kansas. None of the plaintiffs' arguments are sufficient to make out a prima facie case of general jurisdiction, and any additional evidence of sales activities by LeMans would not change this conclusion.

<u>Specific Jurisdiction</u>

For specific jurisdiction, the minimum contacts requirement looks at "whether the defendant purposefully availed itself of the privilege of conducting activities within the forum State." *Monge*, 701 F.3d at 613 (internal quotation marks and citations omitted). This includes considering:

The "requirement of 'purposeful availment' for purposes of specific jurisdiction precludes personal jurisdiction as the result of 'random, fortuitous, or attenuated contacts.'" *Bell Helicopter Textron, Inc. v. HeliQwest Int'l., Ltd.*, 385 F.3d 1291, 1296 (10th Cir. 2004) (quoting *Burger King, Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Although "it is foreseeable that" a product might travel to a forum state, such foreseeability is not "a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World–Wide Volkswagen [v. Woodson]*, 444 U.S. [286] at 295, 100 S.Ct. 559 [(1980)]. "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. 559.

    In addition to the requirement that a defendant "purposefully direct[ ] his activities at residents of the forum," the litigation must "result[ ] from alleged injuries that arise out of or relate to those activities." *Intercon, [Inc. v. Bell Atl. Internet Solutions, Inc.]*, 205 F.3d [1244] at 1247 [(10th Cir. 2000)] (quoting *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174); *see also Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996) (defendant's contacts "must reflect purposeful availment and the cause of action must arise out of those contacts."); *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1092 (10th Cir. 1998) (defendant's actions must "create a substantial connection with the forum state," and the "defendant's presence in the forum [cannot have arisen] from the unilateral acts of someone other than the defendant." (citations omitted) (quotations omitted)).

*Monge*, 701 F.3d at 613-14. The determination of minimum contacts turns on the particular facts of a case with the court examining "the quantity and quality of the contacts." *Id.* at 614.

    With regard to the stream of commerce argument on which the plaintiff relies here, the Tenth Circuit has summarized the two approaches to this theory as discussed in Supreme Court opinions:

Between *World-Wide Volkswagen*, where the Supreme Court first mentioned stream of commerce, and *Asahi*, where the Court next addressed it, courts reached two different interpretations of the stream

> of commerce approach to purposeful availment. *See Asahi [Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty]*, 480 U.S. [102] at 110-111, 107 S. Ct. 1026 [(1987)]; *see also J. McIntyre Mach., Ltd. v. Nicastro*, ---U.S.---, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011). . .
>
> As explained by the *Asahi* plurality, to find purposeful availment, the first approach requires more than placing a product into the stream of commerce. *Asahi*, 480 U.S. at 112 (plurality opinion). The substantial connection between the defendant and the forum "must come about by *an action of the defendant purposefully directed toward the forum State.*" *Id.* (emphasis in original); *see also J. McIntryre*, 131 S. Ct. at 2788-89. Under the second approach, simply placing a product into the stream of commerce is consistent with due process as long as the defendant "is aware that the final product is being marketed in the forum State." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring); *see also J. McIntyre*, 131 S. Ct. at 2788.

*Monge*, 701 F.3d at 619. Also in 2011, a unanimous opinion by the Supreme

Court summarized the stream of commerce theory in these terms:

> The stream-of-commerce metaphor has been invoked frequently in lower court decisions permitting "jurisdiction in products liability cases in which the product has traveled through an extensive chain of distribution before reaching the ultimate consumer." 18 W. Fletcher, *Cyclopedia of the Law of Corporations* § 8640.40, p. 133 (rev. ed.2007). Typically, in such cases, a nonresident defendant, acting outside the forum, places in the stream of commerce a product that ultimately causes harm inside the forum. See generally Dayton, *Personal Jurisdiction and the Stream of Commerce*, 7 Rev. Litigation 239, 262–268 (1988) (discussing origins and evolution of the stream-of-commerce doctrine).
>
> . . . .
>
> Flow of a manufacturer's products into the forum, we have explained, may bolster an affiliation germane to specific jurisdiction. *See, e.g., World–Wide Volkswagen*, 444 U.S., at 297, 100 S.Ct. 559 (where "the sale of a product … is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve … the market for its product in [several] States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others " (emphasis added)).

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. at 2855.

This case certainly requires the court to take a closer look at the stream of commerce theory and the differing interpretations of it. The Supreme Court's decision in *J. McIntyre* rejected the New Jersey Supreme Court's expansive exercise of personal jurisdiction over a British manufacturer based on a finding that "'so long as the manufacturer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.'" 131 S. Ct. at 2785 (quoting *Nicastro v. McIntyre Mach. Am., Ltd.*, 201 N.J. 48, 987 A.2d 575, 591–92 (2010)). Using that test, the state court "concluded that a British manufacturer of scrap metal machines was subject to jurisdiction in New Jersey, even though at no time had it advertised in, sent goods to, or in any relevant sense targeted the State." *Id.* In reversing, the Supreme Court majority did not find the following facts/arguments sufficient for personal jurisdiction:

> First, an independent company agreed to sell J. McIntyre's machines in the United States. J. McIntyre itself did not sell its machines to buyers in this country beyond the U.S. distributor, and there is no allegation that the distributor was under J. McIntyre's control.
> Second, J. McIntyre officials attended annual conventions for the scrap recycling industry to advertise J. McIntyre's machines alongside the distributor. The conventions took place in various states, but never in New Jersey.
> Third, no more than four machines …, including the machine that caused the injuries are the basis for this suit, ended up in New Jersey.
> In addition to these facts emphasized by petitioner, the New Jersey Supreme Court noted that J. McIntyre held both United States and European patents on its recycling technology. 201 N.J. at 55, 987 A.2d at 579. It also noted that the U.S. distributor "structured [its]

> advertising and sales efforts in accordance with" J. McIntyre's
> "direction and guidance whenever possible," and that "at least some of
> the machines were sold on consignment to the distributor." Id. at 55,
> 56, 987 A.2d at 579 (internal quotation marks omitted).

131 S. Ct. at 2786.

Writing for the four-member plurality, Justice Kennedy discussed that the stream of commerce approach in *World-Wide Volkswagen* only "observe[d] that a defendant may in an appropriate case be subject to jurisdiction without entering the forum—itself an unexceptional proposition— as where manufacturers or distributors 'seek to serve' a given State's market." 131 S. Ct. at 2788 (quoting *World-Wide Volkswagen*, 444 U.S. at 298). Thus, the stream of commerce argument is still subject to general principles of personal jurisdiction, that is, "the defendant must purposefully avai[l] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (internal quotation marks and citations omitted). Choosing Justice O'Connor's plurality formulation of the stream of commerce approach in *Asahi* over that of Justice Brennan's, Justice Kennedy wrote in part:

> Since *Asahi* was decided, the courts have sought to reconcile the
> competing opinions. But Justice Brennan's concurrence, advocating a
> rule based on general notions of fairness and foreseeability, is
> inconsistent with the premises of lawful judicial power. This Court's
> precedents make clear that it is the defendant's actions, not his
> expectations, that empower a State's courts to subject him to
> judgment.
>     . . . .
>         . . . [F]oreign corporations will often target or concentrate on
> particular States, subjecting them to specific jurisdiction in those
> forums.

. . . .

    The conclusion that the authority to subject a defendant to judgment depends on purposeful availment, consistent with Justice O'Connor's opinion in *Asahi*, does not by itself resolve many difficult questions of jurisdiction that will arise in particular cases. The defendant's conduct and the economic realities of the market the defendant seeks to serve will differ across cases, and judicial exposition will, in common-law fashion, clarify the contours of that principle.

*J. McIntyre*, 131 S. Ct. at 2789-90. Proof of the defendant manufacturer's purposeful business activities directed at the United States did not establish that it had purposefully directed its activities at New Jersey. *Id.* at 2790. The plurality opinion holds that "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* In short, the plurality opinion takes the stream of commerce plus approach: the product ends up in the forum after being placed into the stream of commerce plus the defendant did something more to purposefully avail itself of the forum's market.

    Concurring in the plurality's judgment, Justice Breyer eschewed settling on just one interpretation from *Asahi* in favor of finding that the facts did not support the exercise of personal jurisdiction under any of the interpretations. He wrote in relevant part:

And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully

aware (and hoping) that such a sale will take place. *See Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 111, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (opinion of O'Connor, J.) (requiring "something more" than simply placing "a product into the stream of commerce," even if defendant is "awar[e]" that the stream "may or will sweep the product into the forum State"); *id.*, at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part and concurring in judgment) (jurisdiction should lie where a sale in a State is part of "the regular and anticipated flow" of commerce into the State, but not where that sale is only an "edd[y]," *i.e.*, an isolated occurrence); id., at 122, 107 S.Ct. 1026 (Stevens, J., concurring in part and concurring in judgment) (indicating that "the volume, the value, and the hazardous character" of a good may affect the jurisdictional inquiry and emphasizing Asahi's "regular course of dealing").

Here, the relevant facts found by the New Jersey Supreme Court show no "regular … flow" or "regular course" of sales in New Jersey; and there is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting activities" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users. *World– Wide Volkswagen*, supra, at 297–298, 100 S.Ct. 559 (internal quotation marks omitted).

*J. McIntyre*, 131 S. Ct. at 2792. Using the different approaches, Justice

Breyer found the record did not show either that the defendant had

established a regular flow of products into New Jersey or that there is

"something more" to evidence the defendant targeting New Jersey. Later in

the concurring opinion, Justice Breyer exposes how the sweeping approach

proposed by the New Jersey Supreme Court is opposed by the Court's

traditional due process analysis:

Under that view, a producer is subject to jurisdiction for a products-liability action so long as it "knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." 201 N.J., at 76–77, 987 A.2d, at 592 (emphasis added). In the context of this case, I cannot agree.

For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum*, and the litigation," it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there. *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (emphasis added). It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum State. But this Court has rejected the notion that a defendant's amenability to suit "travel[s] with the chattel." *World–Wide Volkswagen*, 444 U.S., at 296, 100 S.Ct. 559.

For another, I cannot reconcile so automatic a rule with the constitutional demand for "minimum contacts" and "purposefu[l] avail[ment]," each of which rest upon a particular notion of defendant-focused fairness. *Id.*, at 291, 297, 100 S.Ct. 559 (internal quotation marks omitted). A rule like the New Jersey Supreme Court's would permit every State to assert jurisdiction in a products-liability suit against any domestic manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue.

131 S. Ct. at 2793. Thus, a majority of the Supreme Court in *J. McIntyre*

rejected a stream of commerce approach that dispenses with examining and

weighing the defendant's contacts with the forum[6] and that imposes

---

[6] The plurality noted that, "it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." 131 S. Ct. at 2789.

personal jurisdiction on no more than the defendant's use of a national

distributor who happens to direct product of any quantity to the forum[7].

In discerning and applying a viable holding from *J. McIntyre*, the

courts have looked to the opinion of Justice Breyer:

> *J. McIntyre* was a fragmented decision and no opinion enjoyed the assent of five Justices. Therefore, courts have considered Justice Breyer's concurring opinion as the holding because he concurred in the judgment on only the narrowest of grounds. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds …' "); *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir.2007) (quoting *Marks*, 430 U.S. at 193, 97 S.Ct. 990 (same)).

*Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356, 1366 (M.D. Fla.

2013); *see Ainsworth v. Moffett Engineering, Ltd.*, 716 F.3d 174 (5th Cir.),

*cert. denied*, 134 S. Ct. 644 (2013); *Monje v. Spin Master Inc.*, 2013 WL

2369888, at *5 (D. Ariz. May 29, 2013). While Justice Breyer's opinion still

allows for the differing approaches in *Asahi*, he did retain and emphasize

that the constitutional analysis of minimum contacts "rests upon a particular

notion of defendant-focused fairness." 131 S. Ct. at 2793; *see Grimes v.

Cirrus Industries, Inc.*, 712 F. Supp. 2d 1256, 1261-62 (W.D. Okla. 2010)

(Discussed Tenth Circuit's stream of commerce approach as more restrictive

---

[7] The plurality wrote that, "transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum." 131 S. Ct. at 2788.

than other circuits and as based on more than just the likelihood of the product reaching the forum).

After *J. McIntyre,* the courts applying the stream of commerce approach have focused on such "contact" factors as the defendant's direction or control over the flow of the product into the forum, the quantity of the defendant's particular product regularly flowing into the forum, and the distinctive features of the forum that connect it with the product in question. *See, e.g.*, *Ainsworth v. Moffett Engineering, Ltd.*, 716 F.3d at 179 (Found personal jurisdiction where the defendant foreign manufacturer of a forklift for poultry-related uses had "exclusive sales and distribution agreement" with company who sold in all 50 states, including the forum, quantity of forum sales over last ten years was less than 2%, but the forum was the fourth-largest poultry-producing state); *Echard v. Townsend Farms Incorporated*, ---F. Supp. 2d---, 2014 WL 243141 at *3 (D. Ariz. 2014) (Found no personal jurisdiction where foreign seller of product had only a couple customers in the forum and its sales there were less than 1%, and there was no "something more" connection to the forum); *Crowell v. Analytic Biosurgical Solutions*, 2013 WL 3894999 (S.D.W.Va. Jul. 26, 2013) (Found no personal jurisdiction where foreign manufacturer supplied product to another entity that chose the markets, including the United States, and the manufacturer had no involvement or control over distributor and there was nothing but the possibility that the product "might" be sold in the

forum); *Alphagen Biotech v. Langoost Enterprises, LLC*, 2013 WL 2389792 at *7 (D. Utah May 30, 2013) (Found no personal jurisdiction where defendant manufacturer had no control over distributors and no exclusive distributor in forum, forum sales were less than 2% or "minimal, and there was "nothing to suggest" that the defendant purposefully availed itself of the forum); *Monje v. Spin Master Inc.*, 2013 WL 2369888 (D. Ariz. May 29, 2013) (Found personal jurisdiction where foreign seller had 4.2 million toy sets sold across the United States by its distributor, retained control over distribution shipments, advertised in forum, solicited forum customers through its own website, and responded directly to consumer complaints). Looking at these cases and others, it is evident the courts have evaluated the factors as being interrelated with the greater weight of one factor influencing the impact from deficiencies with the other factors.[8]

The plaintiffs regard the stream of commerce theory as "alive and well" and as a viable "means of exercising personal jurisdiction so long as the defendant's actions (and not the unilateral actions of others) seek to serve the forum state." (Dk. 39, p. 14) (footnote omitted). Citing the difference between the alleged multiple tire sales in Kansas and the few scrap metal machine sales in New Jersey, as discussed in *J. McIntyre*, the plaintiffs say the defendants should draw "no solace" from arguing that the

---

[8]  See Alan G. Schwartz and Kevin M. Smith, *Wading Through the Stream of Commerce: When can Foreign Manufacturers Expect to be Subject to Specific Jurisdiction in United States Courts?* 80 Def. Couns. J. 349, 356 (Oct. 2013).

Supreme Court's recent decision narrowed the stream of commerce theory. The plaintiffs cite Pirelli Group's growing tire sales in North America and its building of tire plants in Mexico as "not only actively seeking out but also achieving a larger piece of the North American market-share, which inherently includes the market-share in the United States and the State of Kansas." (Dk. 39, p. 15). From this, the plaintiffs conclude that the Pirelli Group, in particular the moving defendants have "purposefully availed" themselves of personal jurisdiction in this forum.

Besides the tire sales in North America, the plaintiffs argue the defendants are subject to personal jurisdiction because of having "a sophisticated global distribution system" for selling tires across the United States and in Kansas by going "through a sole and exclusive distributor, [LeMans d/b/a] Parts Unlimited." *Id*. They assert that relationship between the Pirelli Group and Parts Unlimited "is exactly the type of conduct . . . to evidence a corporation's purposeful attempt to serve the market in this state as opposed to merely placing a product in the stream of commerce." *Id*. at p.16. The plaintiffs opine that the *J. McIntyre* Court would find a "deliberate connection" based on "sheer volume of business in terms of dollars." *Id.*

In support of their arguments, the plaintiffs cite the unpublished decision of *Garrard v. Pirelli Tire, LLC*, 2012 WL 2357406 (S.D. Ill. Jun. 20, 2012). The court there denied a challenge to personal jurisdiction brought by Pirelli Deutschland GMBH ("Pirelli DG"), the German manufacturer of a

Metzeler motorcycle tire sold to Yamaha Motor Co. Ltd. Installed on a

Yamaha motorcycle, the tire then was shipped to the United States. The

district court made the following findings from the record:

> Pirelli DG participates in a sophisticated global distribution system that allows its tires to be sold all over the globe. The sole distributor in the United States of Pirelli DG's Metzeler brand tire is Parts Unlimited LLC. The Metzeler tires are sold in countless states including the State of Illinois. Pirelli DG knew of this global distribution network and that the Metzeler would be sold on the American market.

*Garrard*, 2012 WL 2357406 at *2 (record citations omitted). The court relied

on this stream of commerce approach: "A defendant will have the requisite

minimum contacts with the forum State when the defendant 'delivers

products into the stream of commerce with the expectation that they will be

purchased by consumers in the forum State.' *World-Wide Volkswagen Corp.*,

444 U.S. at 298." 2012 WL 2357406 at *2. Emphasizing that the defendant

could expect its product to reach Illinois, the court concluded:

> Here, Pirelli DG placed the Metzeler tire into the stream of commerce through a sophisticated global distribution system. It is clear Pirelli DG expects its Metzeler tires to be purchased in the American market. Accordingly, Pirelli DG must expect its Metzler tires will purchased in Illinois, one of the five largest states in the Nation.
> The Court finds that the exercise of jurisdiction over Pirelli DG does not offend the Due Process Clause of the Fourteenth Amendment.

*Id.* (census citation omitted).

The plaintiffs consider the holding in *Garrard* to be the

inescapable conclusion here. There are several reasons, however, for limiting

the precedential value of *Garrard*. The decision does not provide a

meaningful discussion of the facts or reasoning behind its conclusion of a

"sophisticated global distribution system" that extends even to the independent distributor Parts Unlimited. There are no specific findings on what direction or control, if any, that Pirelli exercised over Parts Unlimited's distribution of motorcycle tires. Instead of looking at Pirelli DG's contacts and efforts directed at Illinois, the *Garrard* decision attaches primary significance principally to Pirelli DG's knowledge of United States' sales through a nationwide distributor. As far as making any connection to the Illinois forum, the court in *Garrard* said it was enough that Illinois is one of the five largest states in population and that "Pirelli DG must expect its Metzeler tires will be purchased in Illinois." 2012 WL 2357406 at *2. The ruling in *Garrard* would conflict with *J. McIntyre* except for it keying on the quantity of sales presumed from a nationwide distribution system and from the population of Illinois. With the population of Kansas in the bottom third of all states, *Garrard's* presumption on sales is not equally applicable here, and its weighting of this factor is certainly not the inescapable conclusion either.

In asserting personal jurisdiction over the foreign parent corporations, Pirelli & C and Pirelli Tyre, the plaintiffs cite the decision of *Cardenas v. Dorel Juvenile Group, Inc.*, 358 F. Supp. 2d 1042 (D. Kan. 2005). This decision offers little in analysis that bears on the issues here. The parties and the court in *Cardenas* presumed that a manufacturer who directly sends a defective product to the forum state would be subject to

personal jurisdiction. The principal question was whether the foreign parent corporation was a "manufacturer" for purposes of the state long-arm jurisdiction. The court found it enough for a prima facie case that the foreign corporation had represented itself to the public as the manufacturer. 358 F. Supp. 2d at 1047-48. The narrow grounds of this decision are revealed in the following:

> The court recognizes that many of the references DI makes to itself as a manufacturer are generic references, not necessarily specific to the subject child safety seat. The evidence for asserting jurisdiction over DI is not compelling. But the court finds it substantial enough to infer that DI is a manufacturer at this stage of the litigation. By holding itself out as a manufacturer, DI has engaged in minimum contacts with state of Kansas.

358 F. Supp. 2d at 1048. Alleging Pirelli & C and Pirelli Tyre to sit atop a sophisticated global distribution network, to exercise some unspecified control, to own some patents, and to perform some risk management is something quite different from Pirelli & C and Pirelli Tyre representing themselves to the public as the manufacturers of motorcycle tires. The plaintiffs fail to present the facts relevant for applying the holding of *Cardenas* here.

Before analyzing the factors underlying the minimum contact analysis, the court needs to revisit the plaintiffs' allegations of the moving defendants having an agency relationship with LeMans. Citing Rosenzweig's deposition, the plaintiffs have evidence that LeMans is Pirelli Tire, LLC's only American customer for Metzeler Motorcycle tires. The plaintiffs, however, fail

to cite the balance of Rosenzweig's testimony on this topic in which he describes LeMans as being only a customer of Pirelli Tire, LLC and as having no other affiliation with a Pirelli entity. (Dk. 38-4, p. 77). Rosenzweig also testified that LeMans closely guards its tire distribution plans and its customer information and does not disclose the same to Pirelli Tire, LLC. *Id.* at 78. Nonetheless, Pirelli Tire, LLC, generally understands that LeMans sells tires to Parts Unlimited dealerships around the country. *Id.* at 79.

The plaintiffs also offer evidence of LeMans d/b/a Parts Unlimited advertising itself as the "World's Largest Distributor of Powersports Aftermarket Parts and Accessories." (Dk. 38-6, p. 1). As part of the record, the plaintiffs have attached as exhibits some printed documents evidencing that Parts Unlimited maintains a website, sells an extensive line of products with many different brands, and markets its sales through at least eight different catalogs. The website does have a dealer locator tool which assists consumers in finding dealers who carry products distributed by Parts Unlimited.

In their conclusory allegations surrounding the Pirelli Group and its use of a "sophisticated global distribution system," the plaintiffs speculate that Parts Unlimited is "a sole and exclusive distributor," and "acts as sales agent for the Pirelli Group and markets their products on its [Parts Unlimited's] website." (Dk. 40, p. 15). The plaintiffs go so far as to describe this as "exactly the type of conduct contemplated by Justice O'Connor in

*Asahi. Id.* at 16. The court does not take as true the plaintiff's allegations of Parts Unlimited being an exclusive distributor by contract and a sales agent for the Pirelli group, for they are not well pled but rather are conclusory and speculative. Moreover, the defendants' affidavits and the Rosenzweig's deposition contradict the plaintiffs' allegations. The facts establish that the customer LeMans places the tire order with Pirelli Tire LLC. LeMans arranges through an international freight service for the tires to be shipped from Brazil to the United States and receives an invoice from Pirelli Tire LLC. LeMans unilaterally decides when and where to distribute these tires in the United States, and the tire manufacturer does not exercise any control, direction, or influence on these distribution decisions or on LeMans' advertising or sales efforts.

Nor do the Supreme Court decisions support the plaintiffs' conclusion that LeMans' involvement here matches what Justice O'Connor was describing in *Asahi*. Among the possible "additional conduct" indicative of "an intent or purpose to serve" the forum state, Justice O'Connor wrote, "marketing the product through a distributor who has agreed to serve as the sales agent in the forum state." 480 U.S. at 112. There is no evidence that the moving defendants intended to "market" the tires through LeMans and that LeMans had "agreed to serve as the sales agent" in Kansas. Instead, LeMans business activities more closely resemble the distributor arrangement rejected in *J. McIntyre* which was "an independent company"

distributing the product in the United States but not under the foreign manufacturer's control. The majority of the court rejected this as a sufficient contact even though the distributor in *J. McIntyre* had agreed to sell the machines in the United States. Thus, LeMans' involvement is even more remote than that rejected in *J. McIntyre*.

The court's research shows that nationwide sales through LeMans d/b/a Parts Unlimited, an independent company, are not a strong factor supporting the exercise of personal jurisdiction in Kansas. There is no evidence of the moving defendants shipping any product directly to this forum. LeMans takes delivery of the tires in Brazil, arranges for the shipping, and markets the tires around the United States without the input, direction or control of the moving defendants. Under similar facts, one court wrote that the forum contacts resulted from "setting its products adrift, which is not enough for this court to exercise personal jurisdiction." *Crowell v. Analytic Biosurgical Solutions*, 2013 WL 3894999 at *5 (S.D.W.Va. Jul. 26, 2013). There is no evidence of "close relationship between manufacturer and distributor." *See Allstate Insurance Company v. Interline Brands, Inc.*, 2014 WL 462814, at 6 (N. D. Tex. Feb. 5, 2014); *see, e.g. Alphagen v. Biotech v. Langoost Enterprises, LLC*, 2013 WL 2389792 at *6-*7 (D. Utah May 20, 2013) (No purposeful availment from limited forum sales made by independent distributors that included wholesalers, e-tailers and retailers, because "these distributors are entirely separate from Defendant and that it

does not control where, when, or how these distributors sell their products, or which customers they target."); *Grimes v. Cirrus Industries, Inc.*, 712 F. Supp. 2d 1256, 1262 (W.D. Okla. 2010) (Specific jurisdiction existed with a distributorship agreement that contained sales quotas for the forum and resulted in regular and ongoing sales within the forum). There is not "something more" to be found in a foreign manufacturer simply sending some product to a company who then ships the product to another company who then retails the product in the forum. *Echard v. Townsend Farms Incorporated*, ---F. Supp. 2d---, 2014 WL 243141 at *3 (D. Ariz. 2014). This is not a situation as in *Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356, 1362 (M.D. Fla. 2013), which involved the defendant Chrysler Canada, the foreign manufacturer, who sold the assembled Chrysler 300M car to Chrysler United States who then distributed these cars to dealers, including Chrysler dealers in the forum of Florida, where thousands of these cars were sold, where the defendant had "billions of dollars in monetary benefit," and where it maintained some business contact with the dealers including warranty coverage. Nor is this a situation of "a foreign manufacturer that pours its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area." *Viasystems, Inc. v. EBM-Papst St Georgen GMBH & Co., KG*, 646 F.3d 589, 597 (8th Cir. 2011) (internal quotation marks and citations omitted).

The plaintiffs point to Metzeler's website ([www.metzeler.com/site/us](http://www.metzeler.com/site/us)) and its dealer locator tool "that does not seem to produce results for the United States." (Dk. 40, p. 6). The court's review of the website revealed dealers for cities in such states like California, Florida, Texas and Illinois, but the locator did not yield any dealers for the major cities and towns in Kansas. Additionally, the website's operation reveals the speculative nature of the plaintiffs' allegations that Parts Unlimited is the exclusive United States distributor/dealer of Metzeler tires. From Metzeler's website's legal information page, the plaintiffs quote ([www.metzeler.com/site/us/about-us/legal-info.html](http://www.metzeler.com/site/us/about-us/legal-info.html)) that it "is an on-line information and communications service provided by Pirelli Tyre S.p.A." A website accessible by forum residents does not subject the defendant website owner to personal jurisdiction, for there must be something more showing the defendant to have aimed "its message at an audience in the forum state." *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011). The Metzeler website does not allow for direct sales and apparently does not identify any Kansas dealers of its products. *See Parah, LLC v. G' Strat LLC*, 2014 WL 545871 at *4-*5 (D. Utah Feb. 10, 2014). The plaintiffs come forward with no arguments or evidence linking the sale of Metzeler tires in Kansas to any unique marketing efforts or distribution agreements aimed at this state or to any distinct activities occurring here or to specific features within this forum. Consequently, these defendant-focused contacts do not

show the moving defendants purposefully availed themselves of the privilege of doing business in Kansas.

As for the factors relevant for minimum contacts under the stream of commerce approach, the above analysis shows that the moving defendants exercise no direction, influence or control over the flow of product into this forum and that there are no distinctive features of Kansas that connect it with the product in question. This leaves the remaining factor on the quantity of the defendant's particular product regularly flowing into the Kansas. The moving defendants have made no direct sales to Kansas and have no direct contacts with anyone marketing or selling the tires in Kansas. *See Otter Products, LLC v. Seal Shield, LLC*, 2014 WL 1213475 at *3 (D. Colo. Mar. 24, 2014) (direct sales and marketing in forum). There is no allegation or evidence that any of the moving defendants' subsidiaries made direct sales of motorcycle tires in Kansas. The plaintiffs do not present anything about sales of Metzeler motorcycle tires in the United States and particularly in Kansas. The plaintiffs have evidence of general tire sales from Pirelli & C's annual financial reports regarding total net sales for all Pirelli products recorded for NAFTA countries, including the United States. As for evidence of motorcycle tire sales in Kansas, the plaintiffs point to their Kansas purchase in 2010 and then presume sales based on the presence of independent Parts Unlimited dealers in Kansas. The plaintiffs' case establishes one Metzeler tire sale and little more than the possibility of other

sales. There is nothing of record indicating the extent to which Metzeler tires flowed into Kansas and were sold here.

In conclusion, none of the "contact" factors in the stream of commerce approach, individually or in combination, satisfy the constitutional analysis of minimum contacts and purposeful availment, "each of which rest upon a particular notion of defendant-focused fairness." *J. McIntyre*, 131 S. Ct. at 2793 (J. Breyer, concurring). Justice Kennedy writing for the plurality in *J. McIntyre* also affirmed the due process restraints on the stream of commerce approach:

> [T]he stream-of-commerce metaphor cannot supersede either the mandate of the Due Process Clause or the limits on judicial authority that Clause ensures. The New Jersey Supreme Court also cited "significant policy reasons" to justify its holding, including the State's "strong interest in protecting its citizens from defective products." *Id.*, at 75, 987 A.2d, at 590. That interest is doubtless strong, but the Constitution commands restraint before discarding liberty in the name of expediency.
> Due process protects petitioner's right to be subject only to lawful authority. At no time did petitioner engage in any activities in New Jersey that reveal an intent to invoke or benefit from the protection of its laws. New Jersey is without power to adjudge the rights and liabilities of J. McIntyre, and its exercise of jurisdiction would violate due process.

131 S. Ct. at 2791. To exercise specific personal jurisdiction on the facts here, the court would have to ignore all notions of "defendant-focused fairness" and follow the New Jersey approach rejected in *J. McIntyre*. The plaintiffs have not made a prima facie showing of personal jurisdiction over the moving defendants.

The plaintiffs alternatively make a blanket request to conduct discovery prior to the court's ruling. The plaintiffs state that, "[d]iscovery should be conducted on a limited basis into whether, among other issues, certain of the *Asahi Metal* additional factors constituting purposeful availment have been met." (Dk. 40, p. 27). "When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion. The trial court, however, is vested with broad discretion and should not be reversed unless discretion is abused." *Budde v. Ling–Temco–Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir.1975). The district court has much discretion in handling jurisdictional discovery matters. *Breakthrough Management v. Chukchansi Gold Casino*, 629 F.3d 1173, 1189 (10th Cir. 2010). "[T]he burden of demonstrating a legal entitlement to jurisdictional discovery—and the related prejudice flowing from the discovery's denial—[is] on the party seeking the discovery . . . ." *Breakthrough Management*, 629 F.3d at 1189 n. 11. "[A] refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant. Prejudice is present where 'pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary." *Sizova v. Nat. Institute of Standards & Technology*, 282 F.3d 1320, 1326 (10th Cir. 2002) (internal quotation marks and citations omitted). The district court does not abuse its discretion by denying jurisdictional discovery where there is a "very low

probability that the lack of discovery affected the outcome of this case." *Bell Helicopter Textron, Inc. v. Heliqwest Intern., Ltd.*, 385 F.3d 1291, 1299 (10th Cir. 2004).

The magistrate judge recently granted the moving defendants' unopposed motion to stay discovery and continue the scheduling conference pending a decision on the pending motions to dismiss. (Dk. 55). The plaintiffs apparently chose not to pursue any jurisdictional discovery during the pendency of these motions. Before filing their response to the motions to dismiss, the plaintiffs did access the deposition of Rosenzweig that apparently was part of the discovery taken for jurisdictional purposes in the *Garrard* case. The plaintiffs' responses fail in their burden to prove a need for additional discovery and prejudice without it. They do not specify what additional facts are jurisdictionally relevant to the court's determination. *See Breakthrough Management*, 629 F.3d at 1190. A hunch or a hope that there may be more to the relationship between LeMans and a Pirelli entity is not enough. *Id.* (district court did not abuse discretion in denying a discovery request "based on little more than a hunch"). The plaintiffs' allegations and arguments lack plausible grounds for thinking that discovery of Kansas sales of Metzeler tires will probably result in a significant factor affecting the court's determination. The plaintiffs have not carried their burden as to justify suspending the court's ruling for jurisdictional discovery.

IT IS THEREFORE ORDERED that the motions to dismiss for lack of personal jurisdiction filed by the defendants, Pirelli & C. S.p.A., (Dk. 30); Pirelli Pneus Ltda ("Pirelli Pneus"), (Dk. 32); Pirelli Tyre S.P. A. ("Pirella Tyre"), (Dk. 34) are granted.

Dated this 12th day of May, 2014, Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge